**M.A.S. HALLABA, individually and as representative of a class of persons similarly situated, Plaintiff,**

v.

**WORLDCOM NETWORK SERVICES INC., a Delaware Corporation, MCI WorldCom Network Services Inc., f/k/a MCI Communications Corporation, a Delaware corporation, MCI Worldcom, Inc., a Georgia corporation, MCI Telecommunications Corporation, a Delaware corporation, Defendants.**

**No. 98–CV–895–H.**

United States District Court,
N.D. Oklahoma.

March 31, 2000.

Order Denying Motion to Vacate
Aug. 25, 2000.

---

Watkins, Chicago, IL, William J. Fleischaker, Roberts Fleischaker Williams, Wilson & Powell, Joplin, MO, for M.A.S. Hallaba, individually and as representative of a class of persons similarly situated, plaintiffs.

Donald Lee Kahl, J. Kevin Hayes, Sarah Jane McKinney, Hall Estill Hardwick Gable, Golden & Nelson, Tulsa, OK, Thomas F. O'Neil, III, Kevin P. Gallagher, MCI Communications Corporation, David A. Handzo, Elizabeth E. Appel Blue, J. Alex Ward, Jenner & Block, Washington, DC, for Worldcom Network Services, Inc., a Delaware corporation, MCI Worldcom Network Services, Inc., a Delaware corporation fka MCI Communications Corporation, MCI Worldcom, Inc., a Georgia corporation, MCI Telecommunications Corporation, a Delaware corporation, defendants.

## ORDER

HOLMES, District Judge.

This matter comes before the Court on Plaintiff's Substitute Motion for Class Certification (Docket # 64). The Court held a hearing on the class certification motion on November 19, 1999. Based upon a careful review of the record and the relevant authorities, the Court finds that the motion should be denied.

### I

Defendants own and operate over 45,000 miles of fiber-optic cable that forms an extensive telecommunications network throughout the United States. *See* Mem. in Support of Pl.'s Substitute Mot. for Class Certification, App., Tab P., Table 1. A large portion of this network exists within railroad or pipeline rights of way, and MCI WorldCom reportedly pays significant yearly lease costs for use of these rights of way.[1] While the record does not indicate precisely who receives the lease payments, it is undisputed that Defendants have obtained leases primarily from railroads and pipeline companies, and not from Plaintiff and other individual landown-

Kenneth E. Crump, Jr., David Phillip Page, Crump & Page LLP, Tulsa, OK, Arthur T. Susman, Charles R. Watkins, Robert E. Williams, William T. Gotfryd, Susman &

1. MCI WorldCom's 1998 Annual Report reflects projected payments of $1.151 billion for "Telecommunications Facilities and Rights of Way" in 1999. *See* Mem. in Support of Pl.'s Substitute Mot. for Class Certification, App., Tab L, p. 36.

ers similarly situated. *See id.,* App., Tabs E–I.

Plaintiff M.A.S. Hallaba owns several parcels of land in Newton County, Missouri that are allegedly burdened by easements given to the Kansas City Southern Railroad. Within the railroad right of way runs a fiber-optic cable allegedly owned by Defendant Worldcom Network Services, Inc. ("WNS") and installed pursuant to an agreement with the railroad.[2] Plaintiff contends that the fiber-optic cable was installed without his permission, that the cable installation went beyond the scope of the railroad's easement, and that Defendants are therefore trespassing upon his land. He alleges causes of action for continuing trespass, unjust enrichment, and fraud.

Plaintiff also seeks to certify a class of similarly situated landowners, contending that Defendants have engaged in a pattern of conduct in laying fiber-optic cable throughout the country along railroad and pipeline easements known by Defendants likely to be too limited in scope to allow for the cable installation without the approval of the servient owner. Plaintiff seeks certification of a class defined as:

> All present and former landowners, except the United States Government, on whose property defendants have installed and operated fiber-optic cable pursuant to railroad and pipeline easements without the permission of the landowners for the installation, maintenance or operation of such cable.

Pl.'s First Amended Compl., at 5.

## II

Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23(a) imposes four prerequisites for class certification. *See, e.g., Amchem Prods. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997). The Court may consider certification of a class only if

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the

class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition to satisfying the requirements under Rule 23(a), a party seeking class certification must also meet one of the requirements under Rule 23(b).

■ In his First Amended Complaint, Plaintiff seeks certification under Rule 23(b)(2) and (b)(3). In his Substitute Motion for Class Certification and the attached memorandum in support, Plaintiff argues for certification under Rule 23(b)(1)(A) and (b)(3) and makes no argument for certification pursuant to 23(b)(2). Additionally, Plaintiff did not argue for Rule 23(b)(2) certification at the November 19, 1999 class certification hearing. Accordingly, the Court need not consider any arguments involving Rule 23(b)(2) and will confine its review to those bases for certification advanced in Plaintiff's substitute class certification motion. *Cf. Asia Strategic Inv. Alliances Ltd. v. General Elec. Capital Servs., Inc.,* 166 F.3d 346, 1998 WL 811606 (10th Cir.1998) (table) (finding issue raised in complaint but not pursued on summary judgment may be deemed waived); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 678 (1st Cir.1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Vaughner v. Pulito,* 804 F.2d 873, 877 n. 2 (5th Cir.1986) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.").

### A

■ As an initial matter, Defendants do not contest the numerosity requirement of Rule 23(a)(1). Moreover, the Court finds that the proposed class potentially contains thousands of parties, rendering it sufficiently numerous to satisfy the first element of Rule 23(a).

---

**2.** Plaintiff asserts that MCI WorldCom, Inc. is the parent corporation of WNS and of MCI World-Com Network Services, Inc. ("MCI WNS"). Ac-

cording to Defendants, MCI WNS was formerly known as MCI Telecommunications Corp. and was referred to in the parties' briefs as "MBIT."

## B

■ Defendants focus their primary objections on the commonality requirement of Rule 23(a)(2). To satisfy Rule 23(a)(2), Plaintiff need not show that all facts or legal issues are common to the class. Rather, he "must demonstrate that there is at least one question of law or fact common to the class." *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir.1999); *accord J.B. v. Valdez*, 186 F.3d 1280, 1288 (10th Cir.1999). Because a single common issue can satisfy commonality, some courts have described the commonality standard as one that is fairly easily met. *See Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994).

■ Commonality is also at the heart of Rule 23(b)(3), which provides for class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The predominance requirement in Rule 23(b)(3) is a more stringent standard of commonality than that in Rule 23(a)(2), and therefore any plaintiff who meets the predominance test will necessarily satisfy the Rule 23(a) commonality test. *See, e.g.,* 7A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1763, p. 227 (2d ed.1986). Accordingly, the Court will review commonality and predominance together. *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Stephenson v. Bell Atlantic Corp.*, 177 F.R.D. 279, 283 n. 2 (D.N.J. 1997).

### 1

Plaintiff contends that the class claims all stem from a common fact—the conduct of Defendants. According to Plaintiff:

> The present case involves several common questions of MCI's conduct that go to the heart of the case, including but not limited to:

> Whether MCI has placed and operated cable on the property of the plaintiff and the members of the class;

> Whether MCI adopted a uniform scheme to install, maintain and operate a commercial telecommunications system along easements nationwide without seeking or obtaining the consent of plaintiff and the members of the plaintiff Class;

> Whether MCI received the consent of the plaintiff and the members of the Class before putting its cable on their property;

> Whether defendant MCI has and continues to intentionally and unlawfully trespass on the lands owned by plaintiff and members of the Class in order to maintain and operate a telecommunications network;

> Whether defendant MCI has been unjustly enriched by profits made through its use of a commercial telecommunications system along the easements which cross the lands owned by plaintiff and members of the plaintiff Class without making rental payments thereon;

> Whether MCI should be enjoined from using the easements granted by plaintiff and the plaintiff Class for purposes other than those specified in the easements; and

> Whether MCI is liable to the plaintiff and the Class for compensatory and/or punitive damages.

Mem. in Support of Pl.'s Substitute Mot. for Class Certification, at 13–14. Plaintiff further contends that the case involves common questions of law. "Being derived from hundreds of years of Anglo–Saxon jurisprudence, in this case the core legal questions raised by plaintiff's trespass-based claim are also common among [class] members and subject to substantially identical state law standards." *Id.* at 15.

Defendants contest commonality both of fact and law. According to Defendants, they pursued no common "policy" or course of action with respect to the building of their fiber-optic networks. They point to the fact that WNS obtained much of its network

through acquisitions of previously constructed networks, as well as through the use of pipeline rights of way by WNS's predecessor, WilTel Corp. MCI WNS, by contrast, constructed its own network, primarily using railroad and highway rights of way. *See* Defs.' Mem. in Opposition to Pl.'s Mot. for Class Certification, at 8. Thus, Defendants state, "no common course of conduct is involved because the networks were built by a number of different corporations at different times, under different managements, and pursuant to different practices." *Id.* Additionally, Defendants contend that each putative class member must prove ownership rights to a servient estate in order to establish a claim for trespass, unjust enrichment, or fraud. According to Defendants, establishing title and interest in the land of each member of the putative class will require a fact-specific inquiry into the relevant title documents and the application of the relevant laws of each state.

■ At the outset, the Court notes that any determination of the common questions of fact requires that the Court first reach a conclusion regarding the legal issues involved in Plaintiff's claim to common questions of law. In other words, the commonality of the facts flows from their legal significance. Thus, determining whether Defendants engaged in a common course of legally significant conduct requires an inquiry into the property rights of the parties, railroads, and pipeline companies. For example, Plaintiff claims Defendant WNS has placed and operated cable on his property. However, WNS has placed cable on property owned by Plain-

tiff only if the Court first determines that the railroad owned an easement, and not a fee. Similarly, Plaintiff claims that Defendants failed to obtain his consent to the cable installation, but his consent was only necessary if he owned the land on which the cable was installed. And, Defendants' actions constitute a trespass on Plaintiff's land only if Plaintiff owns the land and if the railroad had no right to lease the right of way to Defendants. This analysis illustrates that in fact the issue of commonality centers around legal questions of ownership and the scope of property rights. The Court finds that the unique inquiry presented by a property rights case such as this one distinguishes it from cases involving a common course of conduct, such as the securities fraud cases cited by Plaintiff. In those cases, the course of conduct affected the class similarly. *See, e.g., Seidman v. American Mobile Systems, Inc.,* 157 F.R.D. 354, 359 (E.D.Pa.1994) (involving "ongoing course of fraudulent behavior by which [defendants] failed to disclose ... unauthorized transfer of hundreds of millions of dollars"); *In re Texas International Securities Litigation,* 114 F.R.D. 33, 39 (W.D.Okla.1987) (finding course of fraudulent statements made to investing public constituted common course of conduct). In this case, a preliminary legal determination must be made to determine whether an alleged course of conduct is relevant at all.[3]

### 2

Plaintiff's causes of action raise two separate legal questions related to land owner-

---

**3.** Plaintiff attempts to impute to Defendants improper motive and a common course of conduct based on two pieces of evidence that the Court does not find persuasive. Plaintiff relies in part upon a 1983 periodical entitled "Fiber/Laser News," which reported that telecommunications carriers and railroads were aware that the railroads might not have adequate title to grant fiber-optic cable easements on certain parcels. *See* Pl.'s Reply in Support of Substitute Motion for Class Certification, Ex. B. Plaintiff also relies upon lease agreements between railroads and Defendants in which the railroads agreed to share costs of perfecting or defending title and refused to warrant the rights of way at issue. *See* Pl.'s Mem. in Support of Substitute Motion for Class Certification, App., Tabs E–I. Plaintiff believes these documents show a course of con-

duct designed to willfully trespass on his land and that of other class members. The Court does not find this evidence sufficient to show a common course of conduct. The inclusion of indemnification clauses and warranty disclaimers in such large land lease contracts is not unique. The Court will not find improper motive behind the contracting parties' effort to allocate the risks inherent in such a contract. Such risk allocation is in fact standard behavior for any contracting party. Moreover, the recognition in the Fiber/Laser News that railroads may have had title problems with some land parcels does not, standing alone, show that the problem was widespread or that Defendants engaged in any kind of common behavior that would satisfy class action requirements.

ship: first, what interest do the railroad, pipeline, and class members have in the right of way land in question, and second, if the railroad or pipeline only has an easement over the land, whether the scope of that easement allows it to lease part of the right of way to Defendants. While these two general questions may be common to the class, this alone does not suffice to meet the commonality requirements because states may have different legal standards for answering these questions. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir.1996); *Georgine*, 83 F.3d at 627. "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Castano*, 84 F.3d at 741. Differing state law standards combined with different facts of individual land conveyances could suffice to defeat commonality or predominance. Thus, a major question arises as to whether state laws governing land conveyances to railroads and defining the scope of easements are uniform.

Plaintiff claims that the law regarding interpretation of instruments·conveying rights of way to railroads is substantially uniform among the various relevant states. With respect to private conveyances, courts generally find that "[w]hen the purpose is for a right-of-way or the like, the courts are inclined to find an easement." Jon W. Bruce & James W. Ely, Jr., The Law of Easements & Licenses in Land, ¶ 1.06[2][a] (1995). This general principle, however, is not sufficient to resolve the legal questions presented in this case because deeds purportedly granting easements to railroads are often confusing and ambiguous. As one treatise has noted:

> Many deeds purporting to convey land to railroad companies contain various types of references to a right of way in various parts of the deed or with or without such references, contain references to the purpose of the conveyance or, with or without references to right of way or railway purposes, contain other provisions which may be relevant on the issue of whether a fee or easement was intended.

> There appears to be considerable conflict in the cases as to the construction of deeds purporting to convey land, where there is also a reference to a right of way. Some of the conflict may arise by virtue of the twofold meaning of the term "right of way," as referring both to land and to a right of passage. In some cases, particularly where the reference to right of way is in the granting clause, or where there are other relevant factors, the courts have held that an easement only was intended. In other cases, the deed is held to convey a fee simple estate in the land, the courts generally basing their holdings on the ground that the granting clause governs other clauses in the deed, that the reference to right of way did not make the deed ambiguous (therefore barring extrinsic evidence from consideration), or that the reference to right of way was to land and did not relate to the quality of the estate conveyed.

Annotation, *Deed to Railroad Company as Conveying Fee or Easement*, 6 A.L.R.3d 973, § 3(a) (1966) (footnotes omitted). Thus, deeds involving conveyances to railroads pose special problems that defy the general application of a single controlling legal principle for their interpretation.

Moreover, as the above-quoted passage suggests, different states take various approaches to interpreting ambiguous deeds that purport to grant a "right of way." For example, some states find that the use of the words "right of way" anywhere in a deed may raise a presumption that the railroad only received an easement. *See, e.g., Tazian v. Cline*, 686 N.E.2d 95, 98 (Ind.1997) ("The general rule is that a conveyance to a railroad of a strip, piece, or parcel of land, without additional language as to the use or purpose to which the land is to be put or in other ways limiting the estate conveyed, is to be construed as passing an estate in fee, but reference to a right of way in such conveyance generally leads to its construction as conveying only an easement."); *Illinois Central R.R. Co. v. Roberts*, 928 S.W.2d 822, 825 (Ky.Ct.App.1996) ("Where, by instrument or deed, land is purportedly conveyed to a railroad company for the laying of a rail line, the presence of language referring in some manner to a 'right of way' operates to convey a mere easement notwithstanding additional language evidencing the conveyance of a

fee."); *Schuermann Enterprises, Inc. v. St. Louis County,* 436 S.W.2d 666, 667 (Mo. 1969). Other states find the use of the term right of way inconclusive if it is not included in the granting clause itself. *See, e.g., City of Manhattan Beach v. Superior Court of Los Angeles County,* 13 Cal.4th 232, 52 Cal. Rptr.2d 82, 914 P.2d 160, 164–72 (1996) (finding that deed quit-claiming a "right of way" to railroad was ambiguous and that extrinsic evidence revealed conveyance of fee); *Maberry v. Gueths,* 238 Mont. 304, 777 P.2d 1285, 1288 (1989) (finding conveyance of fee to railroad, despite use of "right of way" in legal description); *Dep't of Transp., Highway Div. v. Tolke,* 36 Or.App. 751, 586 P.2d 791, 795–96 (1978) (finding use of term "right of way" in legal description did not suffice to limit railroad's interest to an easement). Additionally, at least one state has invoked the standard principle that deeds are to be construed in favor of the grantee, even when the grantee is a railroad, *see City of Manhattan Beach,* 52 Cal.Rptr.2d 82, 914 P.2d at 167, while another has taken the opposite position and, for public policy reasons, generally construes the deed against the railroad, *see Hefty v. All Other Members of the Certified Settlement Class,* 680 N.E.2d 843, 854–55 (Ind.1997). Thus, the Court finds that the law is not uniform with respect to interpretation of private deeds granting interests to railroads. To the contrary, as noted by the Washington Supreme Court, "[m]any courts have considered whether a railroad deed conveys fee simple title or an easement. The decisions are in considerable disarray and usually turn on a case-by-case examination of each deed." *Brown v. State,* 130 Wash.2d 430, 924 P.2d 908, 911 (1996) (en banc) (internal citation omitted).[4]

Plaintiff faces further difficulties in proving commonality in law for other forms of conveyances to railroads, such as condemnation or legislative grant. State laws governing condemnation vary among the relevant states, with some states allowing a railroad to condemn only an easement, *see e.g., St. Louis, Keokuk & Northwestern Ry. Co. v. Clark,* 121 Mo. 169, 25 S.W. 192, 194 (1893), and others allowing condemnation of a fee simple, especially if the condemnation proceedings clearly stated the interest condemned, *see, e.g., Missouri, K. and T. R.R. Co. v. Miley,* 263 P.2d 415, 417 (Okla.1953). Additionally, condemnation laws in some states have changed, *see, e.g., Eldridge v. City of Greenwood,* 331 S.C. 398, 503 S.E.2d 191, 206–07 (1998) (describing how the South Carolina legislature changed a law that allowed condemnation of fee by passing an 1868 statute limiting railroads to condemnation of easement only). Thus, the Court would be required to determine when the railroad acquired land by condemnation and to ascertain what the railroad's condemnation authority was at that time. If the railroad had sufficient authority to condemn either an easement or a fee, the Court would then have to examine the condemnation proceedings and the attendant facts, just as it would a private conveyance, in order to determine the interests owned by the parties.

Similarly, federal laws granting land or rights of way to railroads are far from uniform. After 1871, Congress generally discontinued its practice of granting railroads fee title to lands in the West and granted only easements instead. *See Great Northern Ry. Co. v. United States,* 315 U.S. 262, 274, 62 S.Ct. 529, 86 L.Ed. 836 (1942). That does not mean, however, that prior to 1871 Congress always granted outright ownership to railroads. *See, e.g., United States v. Union Pac. R.R. Co.,* 353 U.S. 112, 114, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957) (holding that railroad's rights under 1862 act were for surface easement only). Moreover, some federal statutes granting easements explicitly provide for more than just railroad uses. For example, in *Denning v. State of Oklahoma ex rel.*

---

4. Plaintiff's statement of "core state law authorities", *see* Mem. in Support of Pl.'s Substitute Mot. for Class Certification, App., Vol. III, Tab S, nn. 18–19, does not show uniformity in the law on this issue or address the various differences the Court has identified. Instead, it simply asserts certain broad principles and addresses the law in a few select states. This is insufficient either to establish uniformity or to address Defendants' analysis of the differences in state law. *Cf. Castano,* 84 F.3d at 742–43 (finding district court abused its discretion when it "conducted a cursory review of state law variations and gave short shrift to the defendants' arguments concerning variations.")

*Dep't of Transportation,* No. Civ. 90–1317–R, (W.D.Okla.1991) (unreported), the court interpreted an Act of March 2, 1887 that expressly authorized a right of way for railroad, telephone, and telegraph purposes. Pursuant to such a grant, the court held that the railroad could clearly lease the right of way to a telecommunications company for the installation of telephone cable. This brief discussion of the differences in federal land conveyance statutes is not meant to describe the full scope of federal land grant legislation, but rather is meant to show that the Court would have to examine carefully the authorizing legislation for any land acquired by railroads pursuant to federal grant in order to establish the interest conveyed.

 Plaintiff also contends that the relevant law governing the scope of easements is substantially uniform among the various states. Defendants counter that states have adopted different approaches to this question and that the law is unsettled in many states. In general, an easement holder may expand the scope of an easement, but may not unreasonably increase the burden on the servient estate. *See* Bruce & Ely, ¶ 8.03[1]. "Moreover, absent an express provision to the contrary, the servient owner retains all rights to the property with the exception of the easement and may utilize the easement area in any manner that does not interfere with the easement." *Id.,* ¶ 8.04[1].

> In controversies over expanded usage, courts balance the dominant owner's right to enjoy the easement and take advantage of technological innovations with the servient owner's right to make all use of the servient land that does not interfere with the servitude. Since these rights are relative, courts must strive to protect the interests of both parties.

*Id.,* ¶ 8.03[1].

Railroad easements given exclusively for railroad purposes have generally been construed at common law to prohibit the railroad from utilizing the easement for non-railroad purposes. *See Buhl v. U.S. Sprint Communications Co.,* 840 S.W.2d 904, 911–12 (Tenn.1992) ("It is almost everywhere held that the erection of a line of telegraph over the right of way of a railroad company, not to

be used in the operation of the railroad, but for purely commercial purposes, imposes an additional burden on the fee, and the landowner is entitled to additional compensation.") (quoting *W. Union Tel. Co. v. Nashville, Chattanooga & St. Louis Rwy.,* 145 Tenn. 85, 237 S.W. 64, 65 (1922)). At the same time, however, courts have allowed railroads to lease easements for incidental use, if the use is necessary or helpful to the operation of the railroad itself. *See Grand Trunk Railroad v. Richardson,* 91 U.S. 454, 468–69, 23 L.Ed. 356 (1875); *Buhl,* 840 S.W.2d at 911; *Mellon v. S. Pac. Transp. Co.,* 750 F.Supp. 226, 229–30 (W.D.Tex.1990). One key distinction drawn by the cases is whether the railroad itself benefits from the use in question. For example, in *Mellon* the railroad had leased part of its right of way to MCI for installation of fiber-optic cable, while reserving a portion of the cable for its own use. *See Mellon,* 750 F.Supp. at 228. In the instant case, the record contains evidence that at least some lessor railroads or pipelines reserved a right to utilize part of Defendants' network. *See* Mem. in Support of Pl.'s Substitute Mot. for Class Certification, App., Tabs F, I.

 Defendants also assert that the "public highway" doctrine would justify the use of railroad rights of way for installation of communications equipment. Under this doctrine, an easement obtained for a public highway also includes differing modes of transportation and communication, and those modes can change as technology evolves. The law in this area is unsettled. The Court would note, however, that at least one state has applied the public highway doctrine to a railroad easement that was not abandoned when its use was changed from railroad to recreational trails. *See Washington Wildlife Preservation, Inc. v. State,* 329 N.W.2d 543, 546–47 (Minn.1983). In that case, the court concluded that the recreational use of the easement did not change the fundamental transportation purpose for which it was established. As a result, the modification did not constitute an abandonment of the easement. *See id.* The uncertainty surrounding the public highway doctrine suggests applica-

tion of a uniform state standard in this area may prove difficult.

Finally, the scope of an easement can be affected by specific state statutes providing public utilities with statutory authority to use existing easements. For example, a Florida statute authorizes telecommunications companies to install lines along railroad easements, and Florida courts have interpreted this statute to encompass underground fiber-optic cable as well as overhead telephone and telegraph lines. *See Davis v. MCI Telecommunications Corp.*, 606 So.2d 734, 737–39 (Fla.Ct.App.1992).

In sum, the Court finds distinct and numerous differences in the various state laws governing conveyances to railroads and the scope of easements.

### 3

■ The differences in state laws and the fact-intensive review of each deed necessary to establish ownership interests combine to preclude a finding of predominance and superiority under Rule 23(b)(3). Simply stated, the individual issues in this case substantially outweigh the common ones.

■ The Court must consider a number of factors when considering predominance and superiority, including:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). The Advisory Committee that drafted Rule 23(b)(3) provided additional guidance, noting that "Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Advisory Committee Notes to 1966 Amendment; *accord Amchem*, 117 S.Ct. at 2246.

The Committee further explained that "[i]t is only where ... predominance exists that economies can be achieved by means of the class action device." Advisory Committee Notes to 1966 Amendment.

The Court finds that common questions of fact or law do not predominate over individual ones in this case. The heart of Plaintiff's case involves a determination of the land ownership interest of each class member. This is an inherently factual inquiry that requires a careful review of not only the deed, but also, in many instances, the surrounding circumstances. The Court must then determine the applicable state or federal law which, as the Court has already concluded, may vary. This process would be fact-specific and individualized. Additionally, if the conveyance is found to have created an easement, the Court must ascertain the scope of that easement, an inquiry which again is directed by individual state laws.

The Court concludes that the numerous factual and legal decisions this Court will have to make in evaluating the interests of every putative class member render this determination an especially particularized one. *See Brown v. State*, 130 Wash.2d 430, 924 P.2d 908, 911 (1996) (en banc) (decisions on whether deed granted fee or easement "usually turn on a case-by-case examination of each deed"). Such a particularized inquiry does not lend itself to class determination. *See Boughton v. Cotter Corp.*, 65 F.3d 823, 826–28 (10th Cir.1995) (denying Rule 23(b)(3) class certification in case for negligence, trespass, and nuisance resulting from radiation contamination because individual issues such as "whether purchasers were aware contamination existed, the extent and nature of injuries, the degree and length of exposure, the prevalence of contamination and proof of ownership to water rights" predominated); *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1023–24 (11th Cir.1996) (finding individual issues predominated in claims for RICO violations and fraud against "900–number" telemarketing programs where programs differed individually and gaming law in each state varied; "Scrutinizing hundreds of 900–number programs under the provisions of fifty jurisdictions com-

plicated matters exponentially."); *Georgine,* 83 F.3d at 626–30 (holding that individual issues predominated where each plaintiff's exposure to asbestos and resulting injury varied and each state's applicable law differed); *Brancheau v. Residential Mortgage Group, Inc.,* 177 F.R.D. 655, 663 (D.Minn. 1997) (holding, in action under Real Estate Settlement Practices Act, that "[w]hile the ascertainment of the law may raise common issues of legal interpretation, the application of that law, to a myriad of factually distinct transactions, unavoidably raises a plethora of individualized determinations, which elude a broad, encompassing resolution."); *Zapata v. IBP, Inc.,* 167 F.R.D. 147, 166 (D.Kan.1996) (finding hostile environment claims in that case were inherently fact-based and therefore inappropriate for class treatment; class certification "would devolve into a series of individual trials on issues peculiar to each plaintiff"); *Mattoon v. City of Pittsfield,* 128 F.R.D. 17, 21 (D.Mass.1989) (denying class certification in part because "[p]roximate causation with regard to each party remains a thorny, individual question"); *see also In re Ford Motor Co. Vehicle Paint Litigation,* 182 F.R.D. 214, 222 (E.D.La.1998) (denying certification in case for fraudulent concealment of allegedly defective paint jobs because of variations in state laws and factual differences in different models and paint processes spanning seven years).

In support of his motion for class certification, Plaintiff relies upon *Moore v. United States,* 41 Fed.Cl. 394 (1998). In *Moore,* the Court of Federal Claims certified a class of Missouri landowners whose property is traversed by a recreational trail created on abandoned railroad rights of way pursuant to the National Trail System Act. The landowners claimed a reversionary interest (either by a reversionary fee or due to the abandonment of the easement by the railroad) which they contended was taken by the federal government in violation of the Fifth Amendment. The court recognized that "the property interests at stake are defined by separate, original grants to the railroad, whether voluntary or involuntary, which must be examined to ascertain the nature and scope of the property interest conveyed." *Id.* at 398. However, the court reviewed a representative sampling of the conveyances at issue and determined that the variances in the instruments was limited. When combined with what the court determined to be Missouri's general presumption that grants of the type reviewed by the court convey only an easement for a right of way, the court concluded that common issues predominated over individual ones. *See id.* at 399. *Moore* involved over 2000 putative plaintiffs. The size of a state-wide class alone gives an indication of how large Plaintiff's proposed nation-wide class would be. Notably, however, all *Moore* plaintiffs were governed by Missouri law, which was found by the court to create a simplified presumption of an easement. Furthermore, *Moore* involved a limited line of a single railroad and apparently presented many conveyances that were factually similar. By contrast, Plaintiff's proposed class in the instant action would be far larger than that in *Moore,* would encompass many different rail lines, and would involve the application of the law of over forty states. Additionally, the court in *Moore* reviewed a representative sample of conveyances and found them to fall into four general categories. Here, the Court has no such sample, and Plaintiff has provided nothing beyond bare arguments of counsel suggesting a uniformity of conveyances across the country and over many decades. In short, *Moore* involved a limited class, applying the law of only one state. Plaintiff's proposal fundamentally differs from *Moore* in scope and complexity, and it involves much more individualized issues.[5]

5. A review of only the conveyances of Plaintiff's land to the railroad reveals significant differences. Documents submitted by Defendants reflect that the railroad acquired an interest in Plaintiff's land through at least four separate conveyances. Three of the conveyances were private transactions: one entitled "Conveyance to Railroad Uses" for $20, one entitled "Conveyance to Railroad Uses" for $137.60, and one quitclaim deed given for $650. The railroad also condemned land, which was recorded as "Condemnation Proceedings, Judgt for pltff for Right of Way." The first two conveyances "grant bargain sell and convey a fee simple absolute estate in, of, and to, the strip and lot of land and real property." Neither deed contains the words "right of way." However, the deeds could conceivably convey different interests. Under Mis-

The Court also concludes that class certification would not be superior to other available methods of adjudicating cases such as Plaintiff's. "Issues of class action manageability encompass the 'whole range of practical problems that may render the class action format inappropriate for a particular suit.'" *Andrews*, 95 F.3d at 1023 (11th Cir.1996) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Plaintiff suggests that class certification "is the best means of managing a situation that could otherwise disintegrate into piecemeal adjudications of many individual actions involving essentially identical questions of law and fact." Mem. in Support of Pl.'s Substitute Motion for Class Certification, at 23–24. And, in addressing the difficulties posed by the need to review thousands of individual deeds, Plaintiff asserts that "[i]ndividual issues, particularly those of a strictly legal nature could . . . be adjudicated by a special master." *Id.* at 23.

Plaintiff overstates the commonality of the facts at issue. Far from involving actions "involving essentially identical questions of law and fact," the putative class members' claims would likely present thousands of factually unique inquiries and numerous legal questions. The individualized process for determining ownership interests described above would essentially require thousands of mini-trials, applying a variety of state laws. Such a process presents serious difficulties in class management and renders the class action no better than individual adjudication.

See, e.g., *Andrews*, 95 F.3d at 1025; *Georgine*, 83 F.3d at 632–33; *In re American Med. Sys. Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (finding no superiority when class action would have to address different product designs, representations to plaintiffs, and actions taken and injuries suffered by each plaintiff); *see also* 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 4.32, p. 4–134 ("when a court determines that a multitude of minitrials will be necessary to dispose of individual claims, the court will likely find that common questions do not predominate, and the need for numerous minitrials renders the class action unmanageable.").

The Court recognizes that its conclusions regarding commonality, predominance, and superiority differ from those reached by the state superior court in *Hinshaw v. AT & T Corp.*, No. 29D01–9705–CP–000308 (Hamilton Co., Ind., Aug. 24, 1998). To the extent that the facts here are similar to those in *Hinshaw*, the Court simply disagrees with the *Hinshaw* decision. Based upon the facts and the law applicable to this case, the Court finds that Plaintiff has failed to meet the requirements of Rule 23(b)(3) and declines to certify a class under this Rule.

### III

 Even assuming Plaintiff has met the Rule 23(a) requirements, the Court finds that his argument for class certification pursuant to Rule 23(b)(1)(A) also must fail.[6]

---

souri law, a railroad that receives land for a nominal fee takes only an easement, regardless of the language of the conveyance. *See, e.g., Moore v. Missouri Friends of the Wabash Trace Nature Trail, Inc.*, 991 S.W.2d 681, 685–86 (Mo. Ct.App.1999). Thus, depending on how courts have interpreted nominal consideration, the first conveyance could grant an easement while the second could grant a fee. The purpose of this discussion is not to rule on the merits of this issue, but simply to highlight the complexities inherent in determining the nature of the interests for just one plaintiff in just one state.

**6.** Because the Court finds that Plaintiff has failed to satisfy the requirements of Rule 23(b), it need not rule on whether Plaintiff has met the remaining requirements of Rule 23(a), typicality and adequacy of representation. However, the Court notes that, based on the analysis and conclusions

set forth above, there are serious questions as to whether Plaintiff can satisfy these requirements.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." This requirement is related to both the commonality and adequacy of representation requirements. As the Supreme Court has noted:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements also tend to merge with the adequacy of representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

Rule 23(b)(1)(A) provides that a class may be certified if "the prosecution of separate actions by or against the individual members of the classes would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." In order to meet this standard, Plaintiff must establish that individual adjudications could force Defendants to act in legally conflicting ways. As one treatise has stated:

> Under the Rule, it is not enough that separate litigation may result in inconsistent adjudications. Rather, the rule explicitly requires that such adjudication impose incompatible standards of conduct on the party opposing the class. Accordingly, the mere possibility of varying or inconsistent adjudications in which a party may prevail against a putative class member in one case and lose in a second case to another such class member, does not, standing alone, impose incompatible standards of conduct on the party in satisfaction of Rule 23(b)(1)(A). Rather, Rule 23(b)(1)(A) is satisfied only if inconsistent judgments in separate suits would place the party opposing the class in the position of being unable to comply with one judgment without violating the terms of another judgment.

5 Moore's Federal Practice, § 23.41[2][a] (internal footnotes omitted).

Plaintiff argues that if some class plaintiffs prevail and obtain an order of ejectment against Defendants, Defendants will lose key components of their fiber-optic system and could suffer a system blackout. Thus, according to Plaintiff, the "inconsistent standards of conduct" for Defendants would be the loss of certain portions of the network around the country. Defendants respond that separate adjudications will not result in conflicting standards of conduct and that Plaintiff's claims are primarily for damages and therefore are inappropriate for certification under this provision.[7]

Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). At the same time, the typicality prong is a distinct requirement "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees. The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." Georgine, 83 F.3d at 631.

As discussed above, in the instant case the conveyances may differ widely, and different states impose different legal requirements for ascertaining the nature and scope of the parties' interests in land. As a result, it is difficult to conclude that Plaintiff's claim is typical of the class. While factual differences alone will not defeat typicality, in this case the factual differences in conveyances create legal differences depending upon the applicable state law. Plaintiff maintains an interest in prosecuting his claim under Missouri property and tort law. A railroad took a right of way across his land by private conveyances and by condemnation. To the extent that Missouri's law applicable to the case at bar differs from the relevant laws of other states, see supra Part II.B.2, Plaintiff has no incentive to pursue a claim based on a different legal standard. Furthermore, Plaintiff's claim deals only with private conveyances and condemnation and does not involve conveyance by legislative grant. Thus, Plaintiff would have little incentive to pursue claims based on legislative grants. Given the potential legal differences between Plaintiff's claim and those of class members, the Court doubts that Plaintiffs' claims are typical of the class. See Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 340–41 (4th Cir.1998); Sprague v. General Motors Corp., 133 F.3d 388, 399 (6th Cir.), cert. denied, 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998); Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 597 (7th Cir.1993). As the Sixth Circuit has noted, "[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class. That premise is not valid here." Sprague, 133 F.3d at 399. Similarly, that premise does not fit the instant case.

For the same reasons, the Court is further concerned whether Plaintiff would adequately represent the interests of the class. The adequacy of representation prong has two elements: adequacy of counsel and avoiding conflicts of interest between the named parties and the class. See Retired Chicago Police Ass'n, 7 F.3d at 598; 1 Newberg and Conte § 3.13 at p. 3–73. "If the plaintiffs fail to satisfy the typicality test, the plaintiffs also will not be adequate representatives under at least the second prong of the test." 1 Newberg and Conte § 3.13 at p. 3–73. Although the Court has no doubts about the competency of Plaintiff's counsel, Plaintiff simply cannot adequately represent members of a class with whom he has material factual and legal differences.

7. Defendants further argue that, because Rule 23(b)(1)(A) is designed primarily for the benefit of those opposing a class, they may defeat certifi-

The Court finds that separate adjudication of the putative class members' claims would not create conflicting standards of conduct for Defendants. The Court has already described the intensely factual and deed-specific nature of the inquiry necessary to determine if Defendants are trespassing. This inquiry is made more individual in nature by the need to apply the appropriate state law, which the Court has concluded differs in significant ways among the various states. This particularized inquiry means that the result for one plaintiff landowner would have very little impact on the result for a second plaintiff landowner, especially if that plaintiff's land is in a different state and/or if the railroad or pipeline obtained its interest in the right of way from that plaintiff (or his/her predecessor in interest) by an individual rather than form deed.[8] Because the facts and law will differ from plaintiff landowner to plaintiff landowner, the adjudication for each such plaintiff landowner in this case will likely be unique and will pose no threat of inconsistent adjudications of the sort contemplated by Rule 23(b)(1)(A). *See Levels v. Akzo Nobel Salt, Inc.*, 178 F.R.D. 171, 180 (N.D.Ohio 1998) (denying 23(b)(1)(A) certification in Title VII hostile environment case because "the conduct each Plaintiff complains of varies with the individual circumstances" and therefore presents no risk of inconsistent adjudications); *Riordan v. Smith Barney*, 113 F.R.D. 60, 65 (N.D.Ill.1986) (denying 23(b)(1)(A) certification in securities fraud case because each individual adjudication is dependant upon specific facts and therefore would not affect other adjudications); *Ruland v. General Elec. Co.*, 94 F.R.D. 164, 165 (D.Conn.1982) (finding individual adjudica-

tion of nuisance claims against alleged polluter did not present risk of incompatible adjudications). Even if Defendants' fiber-optic cable was trespassing on certain land in different states, and even if Defendants were forced to remove such trespassing cable, this outcome would not present legally conflicting results that would prejudice Defendants or raise concerns about inconsistent rulings within the judicial system.

Because the Court finds that the facts of this case do not fit within Rule 23(b)(1)(A), it need not address Defendants' claim that Plaintiff's claims are inappropriate for consideration under this provision because they primarily seek money damages instead of injunctive relief.

### IV

Finally, Defendants contend that the "local action doctrine" bars class certification in this case. The local action doctrine derives from the common law and provides that actions involving real property, or "local" actions, "can only be brought where the property involved in the action is located." 15 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure: Civil 2d § 3822 (2d ed.1986). The law governing the application of this doctrine in federal courts is unclear. *See id.*, at p. 207–09 (discussing how federal courts have relied upon misleading Supreme Court dictum and not older Supreme Court precedent in erroneously looking to state law to determine whether venue was proper under the local action doctrine). Because the Court has concluded that this case does not meet the class certification requirements of Fed.

---

cation under this provision simply by opposing it and waiving the protection of the Rule. It is generally accepted that Rule 23(b)(1)(A) protects interests of defendants by guarding against the risks attendant in adjudicating similar suits separately. *See* 5 Moore's Federal Practice, § 23.40; 1 Newberg and Conte, § 4.03, at p. 4–11. Additionally, there is some authority for the proposition that certification under this provision is never appropriate when the party opposing the class waives this protection and voluntarily accepts the risk of multiple adjudications. *See* 5 Moore's Federal Practice, § 23.41[3] (citing *Pettco Enter. v. White*, 162 F.R.D. 151, 155 (M.D.Ala.1995); *Fogie v. Rent–A–Center, Inc.*, 867 F.Supp. 1398, 1403 (D.Minn.1993)). However, other commen-

tators have taken issue with this position, noting that "the needs of the judicial system to avoid inconsistent adjudications in a single controversy must be respected, despite the willingness of a litigant to assume the risk." 1 Newberg and Conte, § 4.07, at p. 4–25. Given the Court's conclusion that this case does not satisfy the Rule 23(b)(1)(A) requirements, it need not resolve this issue.

8. The only evidence before the Court regarding conveyances to railroads are those affecting Plaintiff's land. It is worth noting that these conveyances differ in both form and language.

R.Civ.P. 23, it declines to reach this additional argument against class certification.

## V

In sum, the Court finds that Plaintiff has failed to show that common issues predominate over individual issues for purposes of certification pursuant to Fed.R.Civ.P. 23(b)(3). Additionally, the Court finds that the proposed class does not meet the requirements of Fed.R.Civ.P. 23(b)(1)(A). The claims of the putative class members in this case would differ factually and legally from each other, making class certification inappropriate under the Federal Rules of Civil Procedure. Accordingly, Plaintiff's substitute motion for class certification (Docket # 64) is hereby denied.

IT IS SO ORDERED.

## ORDER

This matter comes before the Court on Plaintiff's Motion to Vacate Memorandum Order Dated March 31, 2000 Pending Clarification Regarding Application of Local Action Doctrine and the Subject Matter Jurisdiction of the Court (Docket # 110). Plaintiff moves the Court to vacate its order denying Plaintiff's motion for class certification pending a decision on subject matter jurisdiction. Plaintiff further moves the Court to expressly decide whether the local action doctrine deprives it of jurisdiction over this case. In response, Defendants argue that the Court does not have subject matter jurisdiction, but that this Court need not vacate its prior ruling on class certification. Defendant urges the Court to transfer the matter to the appropriate United States District Court in Missouri pursuant to 28 U.S.C. § 1631.

For the reasons set forth below, the Court finds that it has subject matter jurisdiction over this case and denies Plaintiff's Motion to Vacate.

1. Plaintiff alleges that MCI WorldCom, Inc. is the parent corporation of WNS.

2. Significantly, Defendants raised the local action doctrine only as a reason to deny class

## I

Plaintiff M.A.S. Hallaba owns several parcels of land in Newton County, Missouri that are allegedly burdened by easements granted to the Kansas City Southern Railroad. Within the railroad right of way runs a fiber-optic cable allegedly owned by Defendant Worldcom Network Services, Inc. ("WNS") and installed pursuant to an agreement with the railroad.[1] Plaintiff contends that the fiber-optic cable was installed without his permission, that the cable installation went beyond the scope of the railroad's easement, and that Defendants are therefore trespassing upon his land. He asserts causes of action for continuing trespass, unjust enrichment, and fraud.

Plaintiff sought certification of a nationwide class of similarly-situated landowners on whose property Defendants have installed fiber optic cable. Defendants opposed certification, claiming the proposed class did not meet the requirements of Federal Rule of Civil Procedure 23. Defendants also claimed that the local action doctrine, which requires that disputes over real property be brought in the state where that property is located, precluded class certification.[2] On March 31, 2000, the Court entered an order denying Plaintiff's class certification motion. The Court found that the proposed class did not meet Rule 23 requirements, and the Court therefore did not reach Defendants' arguments with respect to the local action doctrine.

Four days before the Court entered an order denying class certification, Defendants filed a motion to dismiss for lack of subject matter jurisdiction in a separate case, *O'Donohue v. WorldCom Network Svcs., Inc.*, 00-CV-32-H, that was then pending before this Court. In *O'Donohue*, a Missouri landowner asserted a claim of trespass against Defendants that was almost identical to that asserted by Plaintiff Hallaba in the instant case. Defendants in *O'Donohue* claimed that, by virtue of the local action doctrine,

certification and made no suggestion that the local action doctrine deprived the Court of subject matter jurisdiction.

this Court did not have subject matter jurisdiction over Ms. O'Donohue's claim. Ms. O'Donohue voluntarily dismissed her claim shortly after the Court denied class certification in *Hallaba*, obviating the need for the Court to rule on the motion to dismiss. Nevertheless, Defendants' assertion of lack of subject matter jurisdiction in *O'Donohue* did not go unnoticed by Plaintiff Hallaba, who filed the pending motion asking the Court to determine whether it has subject matter jurisdiction in this case.

■ "A court lacking jurisdiction ... must dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is lacking." *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995) (internal quotation marks and citations omitted) (emphasis in original). Moreover, Federal Rule of Civil Procedure 12(h)(3) states that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Therefore, the question before the Court is whether the local action doctrine deprives the Court of subject matter jurisdiction over the instant case.

## II

■ "[C]ourts have distinguished between transitory actions and 'local' actions, which are in rem actions affecting title to real property." 17 Moore's Federal Practice § 110.20[1] (3d ed.). While transitory actions are governed by venue statutes and the law governing personal jurisdiction, a local action can generally be brought only in the state where the property involved in the action is located. *See, e.g., Hayes v. Gulf Oil Corp.*, 821 F.2d 285, 287 (5th Cir.1987); Moore's, § 110.20[3]. The distinction between transitory and local actions traces its origins to the early common law of England. *See, e.g., Keller v. Millice*, 838 F.Supp. 1163, 1169 & n. 1 (S.D.Tex.1993); 15 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure: Civil 2d § 3822 n.1 (2d ed.1986). The leading case establishing the distinction in American common law is *Livingston v. Jefferson*, 15 Fed. Cas. 660 (C.C.D.Va.1811). In *Living-*

*ston*, Chief Justice John Marshall, riding circuit, held that an action against Thomas Jefferson for trespass on land in the Louisiana Territory could not be sustained in a Virginia court because of the local action doctrine. Justice Marshall adopted the settled common law of England that an action for trespass was a local one which could be maintained only in the state or territory where the property at issue was located. Despite some criticism, *see Keller*, 838 F.Supp. at 1170 & n. 3, the local action doctrine remains a viable legal principle today. *See Trust Co. Bank v. U.S. Gypsum Co.*, 950 F.2d 1144, 1148 (5th Cir.1992); *Raphael J. Musicus, Inc. v. Safeway Stores, Inc.*, 743 F.2d 503, 506-07 (7th Cir.1984).

■ As an initial matter, the Court must determine whether Plaintiff's claims are transitory or local in nature. In diversity suits, some courts have applied the law of the forum state to the transitory/local question, while others have considered the question one of federal procedure and applied federal law. *See* Wright, Miller & Cooper, § 3822 at p. 207-09 (citing cases). The Court finds that the better approach, adopted by Justice Marshall in *Livingston v. Jefferson* and endorsed by Moore and Wright, Miller & Cooper, is to apply federal law. Because the Court ultimately finds that the local action doctrine is a venue matter, it is clearly a procedural rule governed by federal law, *see Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 32, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (finding question of venue is procedural and must be decided under federal law). Accordingly, the Court will apply federal law to ascertain whether Plaintiff's claims are local or transitory.

■ Generally, the distinction between local and transitory actions is the same as that between in personam and in rem jurisdiction. *See Casey v. Adams*, 102 U.S. 66, 68, 26 L.Ed. 52 (1880); *Musicus*, 743 F.2d at 506; Moore's, § 110.20[4]. "The reason for this parallel is simply that, in order to provide in rem relief, the court must have jurisdiction over the real property at issue, and a local action must therefore be brought in the jurisdiction in which that real property is located." *Musicus*, 743 F.2d at 506. Tres-

pass actions are an exception to this rule, for they are clearly in personam actions. However, courts in the United States have held them to be local actions since at least *Livingston v. Jefferson* in 1811. As noted above, Chief Justice Marshall in *Livingston* applied the established common law rule that trespass actions are local in nature. *See* 15 Fed. Cas. 660 (C.C.D.Va.1811). Some courts and commentators have criticized the characterization of trespass actions as local, and a few states have rejected the rule. *See Musicus,* 743 F.2d at 510 & n. 5 (listing cases and noting that Louisiana, Minnesota, Arkansas, Missouri, and New Hampshire state courts have rejected the *Livingston* rule); Moore's, § 110 App. 104[2] (urging rejection of the *Livingston* rule). However, federal cases appear to have followed the *Livingston* rule. *See Ellenwood v. Marietta Chair Co.,* 158 U.S. 105, 15 S.Ct. 771, 39 L.Ed. 913 (1895); Wright, Miller & Cooper, § 3822 n.30. Thus, the Court finds that under federal law, an action for trespass is a local action.

 Plaintiff maintains that he also asserted claims for unjust enrichment and fraud, both of which are transitory actions. The Court finds, however, that the issues of trespass and land ownership are at the heart of all of Plaintiff's claims, rendering them essentially local in nature. In *Raphael J. Musicus, Inc. v. Safeway Stores, Inc.,* plaintiff filed suit in Illinois asserting causes of action for breach of lease contracts, fraudulent misrepresentation, and continuing trespass in a case involving a dispute over long-term lease agreements in Nebraska and Montana. 743 F.2d at 505. Defendant sought to dismiss the case based on the local action doctrine, pointing out that the trespass actions were local in nature. The court denied the motion, finding in part that "the primary issue is the respective contractual rights of the parties under the leases; the issue of a trespass is, in fact, incidental and depends entirely on the resolution of the lease construction issues." *Id.* at 511 n. 6. Essentially, the trespass claims in *Musicus* derived from the fact that the defendant continued to occupy the leased buildings. The construction of the lease provisions was determinative of whether Defendant was in fact trespassing.

The instant case presents just the opposite scenario. Plaintiff's primary claim is one for trespass—that is, a claim that Defendants installed fiber-optic cable on his land without his permission. The other claims also derive from the alleged unlawful use of the land. In all three claims, the parties' ownership interests in the land are essential elements. If Defendants have not unlawfully used Plaintiff's land, none of Plaintiff's claims will stand. The potential for dispute over land ownership is a major reason that courts have characterized trespass actions as local, *see Livingston,* 15 Fed. Cas. at 662, and Plaintiff's claims hinge on the dispute over land ownership. Thus, they are essentially local in nature.

This case is similar to *Ellenwood v. Marietta Chair Co.,* 158 U.S. 105, 15 S.Ct. 771, 39 L.Ed. 913 (1895), in which the Supreme Court found an action for continuing trespass and conversion of timber was essentially a claim for trespass that was local in nature. Plaintiff in *Ellenwood* asserted that Marietta Chair Company had entered upon his land and harvested timber continuously for ten years. The Court interpreted his complaint as one for continuing trespass and found that the conversion aspect was merely derivative of the trespass, stating

> This allegation was of a single cause of action, in which the trespass upon the land was the principal thing, and the conversion of the timber was incidental only, and could not, therefore, be maintained by proof of the conversion of personal property without also proving the trespass upon real estate.

*Id.* at 108, 15 S.Ct. 771. Similarly, in the instant case, Plaintiff alleges a trespass, claiming Defendants have no rights in the property on which their fiber optic lines run. Other related claims are derivative of the trespass cause of action. Accordingly, the Court finds that the local action doctrine applies to Plaintiff's claims.

### III

After concluding that the local action doctrine applies, the Court must determine whether the doctrine affects subject matter

jurisdiction or venue. There is much uncertainty on this question. *See Trust Co. Bank v. U.S. Gypsum Co.*, 950 F.2d 1144, 1149 n. 7 (5th Cir.1992) ("It is unclear whether the local action doctrine runs to the jurisdiction or the venue of a court."); *Huszagh v. D'Amico*, 869 F.Supp. 1302, 1303 (N.D.Ill.1994) (noting the local action doctrine "invokes a number of issues that have never been definitively answered," including the venue versus subject matter jurisdiction issue); *Keller v. Millice*, 838 F.Supp. 1163, 1170 (S.D.Tex. 1993) (noting conflicting opinions); Wright, Miller & Cooper, § 3822 ("It is not clear whether the distinction between local and transitory actions runs to the jurisdiction or the venue of the federal court."); Moore's § 110.[5] ("It is not clear whether the local action rule is merely a venue rule or goes to subject matter jurisdiction."); Note, Local Actions in the Federal Courts, 70 Harv. L.Rev. 708, 713 (1957) ("the courts are agreed that the failure to bring a local action in the district where the property lies gives rise to some kind of defect, but are not agreed as to whether the defect is one of jurisdiction or of venue").

The Court finds that the local action doctrine affects venue and not subject matter jurisdiction. A number of cases have expressed this view. *See Musicus*, 743 F.2d at 506–11 (noting, in passing, that the court had subject matter jurisdiction and treating the local action doctrine as a matter of venue); *Haven v. Rzeczpospolita Polska (Republic of Poland)*, 68 F.Supp.2d 947, 950 n. 2 (N.D.Ill. 1999), *aff'd*, 215 F.3d 727 (7th Cir.2000) (treating the local action doctrine as a venue issue to be addressed after questions of subject matter jurisdiction); *Aguinda v. Texaco, Inc.*, 1994 WL 142006 (S.D.N.Y.1994) (analyzing local action doctrine as venue issue). While none of the cases provides an extensive analysis in support of this conclusion, several persuasive reasons support it.

First, the local action doctrine does not affect the Court's power to adjudicate a claim. Jurisdiction is the power to adjudicate. *See, e.g., Neirbo v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68, 60 S.Ct. 153, 84 L.Ed. 167 (1939). A federal district court in the same state and district as the real property at issue clearly has jurisdiction to hear a local action. *See* 28 U.S.C. § 1392 ("Any civil action, of a local nature, involving property located in different districts in the same State, may be brought in any of such districts.") Yet, under the approach urged by Defendants, a federal district court in another state would not have the same jurisdiction. General federal court subject matter jurisdiction must be the same, regardless of the district. Therefore, all federal district courts must have the same jurisdiction to hear local actions. *See* Moore's, § 110.20[5].

Second, the local action doctrine is best characterized as a rule of convenience which, like personal jurisdiction and venue, can be waived if not contested in the first response to the complaint. Venue primarily seeks to establish a convenient forum for the parties and witnesses. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). One court, in defending the viability of the local action doctrine, stated that the local action rule "ensure[s] that real property actions will be tried in a convenient forum and that orderly notice to all interested parties—through [state] land title records—will be facilitated." *Hayes v. Gulf Oil Corp.*, 821 F.2d 285, 290 (5th Cir.1987). This provides a strong justification for venue, which is, after all, concerned primarily with convenience. Additionally, the local action doctrine is clearly equated with in rem actions. *See, e.g., Musicus*, 743 F.2d at 506. As noted by one treatise, "[t]o the extent that the local action rule parallels the distinction between in rem and in personam jurisdiction, it too should be treated at most as a personal jurisdiction defect, which, like venue objections, is waivable if not raised in the first response to the complaint." Moore's, § 110.20[5].

Third, the federal venue statutes mention local actions, strongly suggesting that Congress intended for local actions to be addressed through venue laws. 28 U.S.C. § 1392 applies to actions "of a local nature," and 28 U.S.C. § 1391 establishes the situs of property that is the subject of an action as a grounds for venue. The Court "presume[s] that Congress is knowledgeable about exist-

ing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 185, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988), and the Court therefore presumes that Congress sought to clarify that the local action doctrine was a rule of venue when it drafted the venue statutes. Notably, the statutes governing subject matter jurisdiction make no mention of local actions, despite the fact that the local action doctrine has existed in this country for almost two hundred years. The inclusion of local actions in venue statutes and the exclusion of local actions from the subject matter jurisdiction statutes reflects that Congress knows how to address local actions when it so chooses. *See, e.g., Fischer Imaging Corp. v. General Electric Co.,* 187 F.3d 1165, 1173 n. 8 (10th Cir.1999); *United States v. Oberle,* 136 F.3d 1414, 1423–24 (10th Cir.), *cert. denied,* 525 U.S. 885, 119 S.Ct. 197, 142 L.Ed.2d 161 (1998). Congress chose to characterize local actions in venue provisions only.

In contrast, cases that find the local action doctrine is a rule of subject matter jurisdiction provide no persuasive reasons for this conclusion. For example, in *Hayes v. Gulf Oil Corp.,* 821 F.2d 285, 290 (5th Cir.1987), the court carefully explained the importance of the local action rule, stating:

> The rationale for the rule is as forceful today as it was in Chief Justice Marshall's time.... If litigants were free to file claims to the same Colorado real property in different federal and state courts throughout the country, the State of Colorado could not give conflicting judgments full faith and credit. More significantly, title to real estate would never be certain again since it could be involved in unknown claims in unknown fora with no practical method for control of liens, lis pendens or priority of title claims. State land title records would become unmanageable. The local action rule prevents courts unfamiliar with local property rights and laws from interfering with title to real property which must be recorded under a unitary

set of rules to keep it free of conflicting encumbrances.

*Id.* at 290. However, these justifications for the rule do not explain why it deprives federal courts of subject matter jurisdiction. Liens and ownership interests would still have to be filed in the state where the property is located to be effective, regardless of where the claim is litigated. Certainly, a court in a different state may order the parties to make such filings.

Significantly, when faced with the question of venue or subject matter jurisdiction, the *Hayes* court simply claimed to be bound by precedent, citing *Iselin v. Meng,* 269 F.2d 345 (5th Cir.1959). *See Hayes,* 821 F.2d at 291. *Iselin,* in turn, stated without explanation that a Louisiana federal court would not have subject matter jurisdiction over a suit involving a property in Mississippi. *See* 269 F.2d at 347. Thus, the *Hayes* opinion provides no substantive basis for its conclusion on this issue.[3] Other opinions include similarly summary explanations for holding that the local action doctrine deprives federal courts of subject matter jurisdiction. *See General Electric Capital Corp. v. East Coast Yacht Sales Inc.,* 757 F.Supp. 19, 21 (E.D.Pa. 1991) (reaching summary conclusion); *Rogers v. Clipper Cruise Lines, Inc.,* 650 F.Supp. 143, 146 (D.Colo.1986) (same).

Striking a theme similar to that noted in *Hayes,* the court in *Kavouras v. Fernandez,* 737 F.Supp. 477 (N.D.Ill.1989), claimed that it did not have jurisdiction to hear a local action from another state because it could not interfere with another state's property recording scheme. In a case involving a *pro se* complaint for a foreclosure of property in Wisconsin, the District Court for the Northern District of Illinois noted that it had no power over local officials in Wisconsin to order a foreclosure sale. The court further stated that

> To hold that the limitation is merely one of venue and hence waivable would place this Court in the untenable position of purport-

---

**3.** Interestingly, the Fifth Circuit, subsequent to the *Hayes* decision, observed that "It is unclear whether the local action doctrine runs to the jurisdiction or the venue of a court." *Trust Co. Bank v. U.S.Gypsum Co.,* 950 F.2d 1144, 1149 n.

7 (5th Cir.1992). It then cited to its own opinion in *Hayes* and the Seventh Circuit's opinion in *Musicus.* Clearly, this footnote undermines any claim that *Hayes* is dispositive authority on the issue of subject matter jurisdiction.

ing to affect real estate title records in Wisconsin, purporting to require local officials there (over whom this Court clearly has no jurisdiction) to conduct a foreclosure sale or record its results.

*Id.* at 478.

This reasoning is both flawed and inapplicable to the case at bar. This Court can clearly render decisions that "affect" the real estate title records in state court, such as, for example, deciding to set aside a fraudulent conveyance. *See Sax v. Sax,* 294 F.2d 133, 136–37 (5th Cir.1961); *Ely v. Smith,* 764 F.Supp. 1413, 1416 (D.Kan.1991). Moreover, the instant case presents no threat that the Court might be required to order a Missouri state official to take some action. Thus, the rationale in *Kavouras* is unpersuasive, and the concerns about the limitations on the authority of federal courts to act upon the property do not apply to the facts of this case.[4]

Finally, a number of older cases dismissed local actions for lack of subject matter jurisdiction. However, as Wright, Miller & Cooper explain, "at least the early cases holding the defect non-waivable can be explained because they came down at a period when the distinction between jurisdiction and venue was not clearly understood." Wright, Miller & Cooper, § 3822, at p. 207 (footnotes omitted). The treatise notes that the Supreme Court did not clearly establish until 1923 that venue defects, in contrast to subject matter jurisdiction defects, are waivable. *See id.* at p. 207 n. 21. Prior to that time (and occasionally since then), courts confused or failed to distinguish between the concepts. *See id.* at § 3801.

■ In sum, the Court finds that the better approach is to treat the local action doctrine as a rule of venue. As such, it is waivable. In this case, Defendants answered Plaintiff's amended complaint and failed to raise venue in the answer. To the contrary, Defendants admitted venue in their answer.

Thus, Defendants have waived any objection to venue. *See* Fed.R.Civ.P. 12(h)(1).

Based on the above, the Court finds that it has subject matter jurisdiction over this case. Accordingly, Plaintiff's motion to vacate the Court's Order of March 31, 2000 (Docket # 110) is hereby denied, and Defendants' suggestion that the case be transferred pursuant to 28 U.S.C. § 1631 is moot.

IT IS SO ORDERED.

---

4. The Court notes that it has in the past taken actions to adjudicate the ownership interests of real property in another state. For example, in *United States v. Terry Wayne Glenn,* No. 96–CR–151–2–H, the Court was required to determine the true ownership of certain Missouri real property as a part of a forfeiture claim included in a

criminal prosecution by the United States. If the local action doctrine was a rule of subject matter jurisdiction, the government would be forced to bring such an interstate criminal forfeiture action in multiple states, whether or not the ownership of the real property sought to be forfeited was contested.